## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

| | |
|---|---|
| CORY ESPINOLA**,** *individually and on behalf of all others similarly situatied,* | |
| Plaintiff, | **CASE NO.:** |
| v. | **CLASS ACTION** |
| EVOLVE BANK & TRUST, an Arkansas bank; EVOLVE BANCORP, INC., an Arkansas limited liability company; AMG NATIONAL TRUST, a Colorado bank; LINEAGE BANK, a Tennessee bank; and AMERICAN BANK, Inc. a Pennsylvania bank, | **JURY TRIAL DEMANDED** |
| Defendants. | |

### CLASS ACTION COMPLAINT

Plaintiff Cory Espinola brings this class action complaint individually and on behalf of all others similarly situated against against American Bank, Inc. ("American"), AMG National Trust ("AMG"), Evolve Bank & Trust and Evolve Bancorp Inc. ("Evolve"), and Lineage Bank ("Lineage") (collectively, the "Partner Banks" or "Defendants").

## I.      INTRODUCTION

1.      This case is about tens of millions of dollars of missing money due to the gross mismanagement of consumer cash deposits by the Partner Banks American, AMG, Evolve, and Lineage. Specifically, Plaintiff and class members used various financial technology platforms ("FinTechs") to deposit hundreds of millions of dollars at the Partner Banks. Fueled by mass adoption during and after the COVID-19 pandemic, the use of financial technology platforms

("FinTechs") has exploded in recent years, with as much as 55% of consumers reporting that they rely in fintech applications to weather economic challenges.[1] However, the rapid expansion of these technologies presents a material risk to consumers' finances.[2]

2.      Because these FinTech platforms are not banking entities, they relied on the Partner Banks to hold and manage these consumer-deposited funds. The Partner Banks subsequently outsourced critical account management tasks to Synapse Financial Technologies, Inc. ("Synapse"), an intermediary tasked with opening accounts, processing transactions, and maintaining the financial ledgers for about 100 FinTech companies and their users.

3.      Unfortunately for Plaintiff and all members of the class, this arrangement collapsed when significant discrepancies were discovered in Synapse's account ledgers. The inaccurate records left the Partner Banks claiming they were unable to verify customer balances or properly allocate funds. Consequently, large sums of consumer funds were lost, stolen, or mishandled, with each Partner Bank deflecting blame onto others. As a result, thousands of affected customers have been denied access to their deposits, and despite repeated demands, the Partner Banks have refused to return tens of millions of dollars in funds.

4.      Plaintiff brings this class action lawsuit to account for the missing funds and have them immediately returned to their rightful owners.

## II.      PARTIES

---

[1] *See* https://plaid.com/resources/fintech/fintech-trends/

[2] *See* e.g. https://www.consumerfinance.gov/about-us/newsroom/cfpb-finalizes-rule-on-federal-oversight-of-popular-digital-payment-apps-to-protect-personal-data-reduce-fraud-and-stop-illegal-debanking/#:~:text=The%20CFPB%20is%20particularly%20concerned,managing%20them%20on%20their%20own.

5.      Plaintiff Cory Espinola is a citizen and resident of the State of New York. She was present in New York at the time she signed up for an account with the FinTech Juno and deposited funds.

6.      Defendant American Bank, Inc. is a bank organized under the laws of Pennsylvania whose corporate headquarters and principal place of business is located at 615 Waterfront Dravie, Suite 501, Allentown, Pennsylvania 18102.

7.      Defendant AMG National Trust is a bank organized under the laws of Colorado whose corporate headquarters and principal place of business is located at 6295 Greenwood Plaza Blvd, Greenwood Village, Colorado 80111.

8.      Defendant Evolve Bank & Trust is a bank organized under the laws of Arkansas with locations in California. Its corporate headquarters and principal place of business is located at 6000 Poplar Avenue, Suite 300, Memphis, Tennessee, 38119.

9.      Defendant Evolve Bancorp, Inc. is a bank holding company organized under the laws of Arkansas whose corporate headquarters and principal place of business is located at 6000 Poplar Avenue, Suite 300, Memphis, Tennessee, 38119.

10.     Defendant Lineage Bank is a bank organized under the laws of Tennessee whose corporate headquarters and principal place of business is located at 120 5th Ave N, Franklin, Tennessee 37064.

## III.    JURISDICTION & VENUE

11.     This Court has jurisdiction over this lawsuit under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2), because this is a proposed class action in which: (i) there are at least 100 class members; (ii) the aggregate amount in controversy exceeds $5,000,000, exclusive of interest

and costs; and (iii) at least one putative class member and one Defendant are citizens of different states.

13. Venue is proper in this district pursuant to 28 U.S.C. § 1391 because a substantial part of the events giving rise to the claims herein occurred in this judicial district.

13. Further, as set forth herein, Defendants have contacts in this district sufficient to subject them to the personal jurisdiction of this district as if this district were a separate state. On information and belief, Defendants transacted with consumers in this district. On information and belief, Defendants continuously and systematically offered banking services to consumers in this District, maintained an interactive commercial service through the FinTechs at issue, and allowed customers in this District to transact with Defendants. On information and belief, Defendants all conduct substantial business in this District and a substantial part of the acts and omissions complained of occurred in this District. On information and belief, each Defendant has a physical presence in Colorado, offers banking services in Colorado, and/or transacts with customers physically present in Colorado. Additionally, AMG is organized under the laws of Colorado and has its principal place of business in Colorado.

14. Exercising jurisdiction over Defendants is fair, just, and reasonable considering the quality and nature of Defendants' acts that occur in Colorado and which affect interests located in Colorado. On information and belief, Defendants have purposefully availed themselves of the privilege of conducting activities in Colorado, and should reasonably anticipate being haled into court in Colorado.

## IV.    GENERAL ALLEGATIONS

### A.  Background of Fintech and Synapse

15.     FinTech companies specialize in developing software designed to empower individuals in managing their finances. These companies typically provide sleek, user-friendly web and mobile applications as cutting-edge alternatives to the more traditional banking experience, and includes an array of financial services such as mobile banking, online lending, digital payment, and other services.

16.     Importantly, FinTechs are not banks and are not subject to the same regulatory scrutiny as traditional financial institutions. Because FinTechs lack the regulatory authority to accept or directly hold customer deposits, they partner with licensed and regulated institutions referred to as partner banks. It is these regulated partner banks who take on the critical role of securely holding and managing customer funds. Through this arrangement, customers (sometimes referred to as "end users") can seamlessly deposit money or conduct other transactions with partner banks via the FinTechs' platforms, all the while the end users entrust the partner banks to ensure the safekeeping of their funds.

17.     FinTech users understandably expected their funds to be held by the partner banks in a safe, secure, and reliable manner, always accessible for withdrawal on demand. Moreover, they trusted that the account balances prominently displayed on the FinTech platforms were accurate and reflective of their actual financial holdings.

18.     Established in 2014, Synapse Financial Technologies, Inc. positioned itself as a groundbreaking innovator in the emerging banking-as-a-service ("BaaS") sphere. According to a 2021 report by Deloitte, BaaS is the provision of banking products and services through third-

party distributors (i.e., the FinTech companies).[3] Synapse acted as a middle man, positioning itself as an intermediary between traditional banking institutions and FinTech companies.

19.    In particular, Synapse worked with about 100 FinTech firms (known as "FinTech Partners"), and coordinated the opening of deposit accounts for the FinTech Partners' respective end users at four separate banks—Evolve, American Bank, AMG, and Lineage (the "Partner Banks")—while overseeing and maintaining each account's ledger.

20.    More concretely, beginning in 2014, Synapse arranged for Demand Deposit Accounts ("DDAs") on behalf of nearly 100 FinTech companies and their customers at the Partner Banks. By 2020, Synapse had expanded these services through its subsidiary, Synapse Brokerage LLC ("Synapse Brokerage"), introducing a sophisticated cash management program. Through this program, it began establishing Cash Management Accounts ("CMA Accounts") for FinTech clients and their end users at the Partner Banks. The majority of customer funds were kept in omnibus "For Benefit Of" Accounts ("FBO Accounts"), while the remaining balances were held in DDAs spread across the four Partner Banks.

21.    In carrying out these operations, Synapse integrated data received from the Partner Banks with its own customer transaction information, then transmitted this aggregated data back to the FinTechs. This arrangement meant that FinTech users depended on both the FinTech platforms and the Partner Banks for accurate fund accounting. In turn, the FinTechs and Partner Banks relied on Synapse to meticulously track and report each user's financial position.

22.    On April 22, 2024, Synapse filed for Chapter 11 bankruptcy protection in the Central District of California.[4] In the aftermath of this filing, it was revealed that approximately

---

[3] *Banking as a Service, Explained*, Deloitte Consulting LLP (2021), available at https://www2.deloitte.com/cn/en/pages/financial-services/articles/importance-of-banking-as-a-service.html.
[4] *In re Synapse Financial Technoloies, Inc.*, Case No. 1:24-bk-10646 (C.D. Cal. Bkr.).

$85 million in customer funds—belonging to around 100,000 individuals—had inexplicably disappeared.

23.     In a series of reports filed by the Synapse Bankruptcy Trustee (the "Trustee"), the Trustee revealed the labyrinthine nature of Synapse's business operations. For example, through meetings and discussions with stakeholders (including the Partner Banks, former Synapse employees, external consultants, and others), it was revealed that in some instances, end user deposits through a Fintech Partner were deposited in an account at one Partner Bank, while end user withdrawals through that same Fintech Partner were processed from a different account at a different Partner Bank. The Trustee found that this convoluted business model, and the reliance on it therein, makes it both essential and difficult to reconcile transactions and ensure end users receive access to the correct amount of funds they are due. Indeed, the Trustee also learned that Synapse erroneously maintained a single, intertwined ledger with a subsidiary brokerage, and had to employ individuals who were specifically tasked with trying to disentangle transactions between the two entities during the daily course of business operations.

24.     Subsequent bankruptcy proceedings have laid bare a series of grave oversights, including the failure of Synapse and the Partner Banks to maintain accurate and reliable ledgers. The Trustee learned specifically that Evolve was not able to accuraetly reconcile its deposits against the Synapse ledgers in part due to its view that Synapse's ledger—which is proprietary—was too difficult to interpret without expertise from persons familiar with the systems. In any event, at the time of the bankruptcy, none of the Partner Banks were able to determine whether end user funds or negative balance accounts were moved among other Partner Banks in a way that increased or decreased the shortfalls that existed at each Partner Bank earlier in time. In fact, in direct

response to Synapse's and the Partner Banks failures, the FDIC proposed a new recordkeeping

rule for banks receiving deposits from third-party, non-bank companies.[5]

25.    As a direct consequence of Synapse and the Partner Banks failures, numerous

customers have been left cut off from their funds, unable to pay essential bills, and struggling to

meet day-to-day financial needs.

**B. Defendants' Failure to Fully Return Consumer Deposits**

26.    In the aftermath of Synapse's downfall, the Partner Banks represented that they

were making a concerted effort to reconcile customer balances and address the substantially

erroneous account records. Despite these alleged measures, not all FinTech user deposits have been

properly accounted for or returned. Instead, each of the four Partner Banks has either (a) placed

the blame on the others for being unable to disentangle Synapse's disordered ledgers and

completely locate missing user funds, or (b) declared that all of the funds in their possession have

already been disbursed.

27.    Filings from Synapse's bankruptcy proceeding dated November 2024 indicate that

Evolve publicly announced it had completed its reconciliation process as of October 18, 2024.

Evolve further stated that starting November 4, 2024, it would begin notifying end users of their

balances and initiating distributions. Nonetheless, according to information from the bankruptcy

Trustee and various public sources, many customers who received these notices found that Evolve

claimed to hold significantly less than the amounts reflected on Synapse's own ledgers. As a

consequence, Evolve intends to distribute markedly smaller sums than those recorded, even

pennies on the dollar,[6] while insisting that the missing balances reside at other Partner Banks.

---

[5]    *See*  https://www.fdic.gov/news/press-releases/2024/fdic-proposes-deposit-insurance-recordkeeping-rule-banks-third-party
[6] *See* https://www.bankingdive.com/news/evolve-offers-yotta-juno-customers-pennies/732691/ ("Some consumers –
not just direct customers of Evolve or Synapse, but of fintech partners like Yotta and Juno, which held their funds in

28.     Contrary to Evolve's insistence, AMG and Lineage have rejected Evolve's assertions regarding the accuracy of its reconciliation, including that balances are residing at their institutions. Both AMG and Lineage deny possessing substantial additional funds owed to FinTech customers and assert that they have already distributed over 99% and 90%, respectively, of the amounts for which they were responsible. Despite their assertions, the two institutions have publicly maintained that "determining individual end-user balances by bank was unfeasible because Synapse frequently executed large, indiscriminate transfers of funds between banks, unrelated to any particular customer or transaction."

29.     Nevertheless, by necessity, this money has not simply vanished, and the missing funds must still be under the control of one or more of these Partner Banks. While the respective Partner Banks shift blame, the end result is that countless customers remain unable to access their deposited funds, leaving them uncertain as to which Partner Bank actually holds their money.

## C. Defendants' Failures are Exposed by Their Inability to Maintain and Disburse Customer Funds

30.     Banks are expected to develop robust contingency and business continuity plans that prepare them for the potential breakdown of critical third-party relationships. Synapse clearly functioned as such a critical partner, yet none of the Partner Banks had an actionable plan in place to handle Synapse's operational setbacks, let alone its outright failure.

31.     The Partner Banks' inability to accurately track and promptly release customer funds exposes severe shortcomings in their risk management practices.

---

Evolve and used Synapse as the conduit – believe they've lost their life savings after the bank's reconciliation process found them paltry sums, like $0.84 on $10,328 and $9.01 on $28,660).

32.     Consider Evolve. The Federal Reserve issued a cease-and-desist order against it on June 14, 2024—just two months after Synapse filed for bankruptcy. This action arose from a 2023 examination, meaning Evolve had been aware of serious operational and compliance deficiencies for at least a full year before Synapse's bankruptcy became public. Indeed, directly relating to Synapse, the Federal Reserve required Evolve to submit a written plan that included, among other critical items, "steps to enable the timely identification, measurement, and reporting of risk exposures associated with each fintech partner, product, program, service, business line, or customer," as well as "appropriate policies, procedures, processes, and controls to ensure that ledger and sub-ledger responsibilities of the bank and fintech partners are clearly defined, established, and maintained, including in the event of a material business disruption."

33.     Lineage Bank, likewise, entered into a consent order with the FDIC on January 30, 2024, four months before Synapse's bankruptcy filing. Its extensive detail and the wide range of issues it covers evidence the substantial compliance problems were known to Lineage well in advance of Synapse's collapse. The FDIC required Lineage's board to "develop and implement a plan to enhance the internal audit functions to include evaluation of risk controls for high risk areas of the bank, including . . . on boarding deposits obtained through third parties," as well as a "contingency plan . . . detailing how the Bank will administer an effective and orderly termination with significant third-party FinTech partners."

34.     The Partner Banks' lack of direct ledger access, insufficient contingency planning, and failure to maintain independent, accurate records, while blindly relying on Synapse, all contributed to their fundamental dereliction of duty: they failed to keep track of their customers' money.

35.     The collapse of a single tech startup left several banks incapable of processing accounts collectively worth over $250 million, with substantial funds still inaccessible months later. Credible sources suggest that many millions remain unaccounted for.

36.     Had the Partner Banks demanded clearer reconciliations or better insights into Synapse's systems earlier on, they might have uncovered these problems and resolved them without suspending customer access to their deposits.

37.     Instead, customers—including Plaintiff and Class Members—who deposited money into the Partner Banks through various FinTechs have been unable to retrieve their funds for months.

38.     Even now, Plaintiff and Class Members have been offered only a fraction of the total amounts they entrusted to the Partner Banks. On information and belief, the remainder of these funds still sit within the Partner Banks' control, and it appears the banks intend to retain possession of this money, despite it belonging to Plaintiff and Class Members.

**V.     PLAINTIFF ESPINOLA'S EXPERIENCE**

39.     On or around April of 2021, Plaintiff began using the services of the FinTech company Juno.

40.     As part of her transactions with Juno, Plaintiff entered into a Consumer Interest Checking Account Agreement with Synapse, as an agent of and on behalf of Defendant Evolve Bank & Trust.

41.     As of May 23, 2024, Plaintiff's Juno statement indicated a balance of $34,033.03. The statement specifies "Banking services provided by Evolve Bank & Trust."

42.     After Synapse's collapse and Evolve's reconciliation, Evolve indicated to Plaintiff that her reconciliation payment would be $0.

43.     Based on representations by Synapse and the Partner Banks, Plaintiff's funds were deposited with, and moved between, Evolve and other the Partner Banks by Synapse.

44.     Upon information and belief, Plaintiff's funds remain in the possession and control of the Partner Banks.

45.     To date, Plaintiff has still not received or been able to access any of her funds from Evolve or the other Partner Banks.

## VI.    CLASS ALLEGATIONS

46.     Plaintiff brings this action on behalf of herself and all persons similarly situated pursuant to Rule 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure and seeks certification of the following class:

> All persons residing in the United States who have been denied access to their funds deposited through Synapse and held by Evolve Bank and Trust, AMG National Trust, American Bank, or Lineage Bank, beginning April 22, 2024.

47.     The nationwide Class is collectively referred to as the "Class" and "Class Members." Excluded from the Class are the Defendants or Synapse, the officers and directors of the Defendants or Synapse at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which either Defendants or Synapse have or had a controlling interest, and any court personel and judicial officers assigned to this case.

48.     Plaintiff reserves the right to expand, limit, modify, or amend the class definitions stated above, including the addition of one or more subclasses, in connection with a motion for class certification, or at any other time, based upon, among other things, changing circumstances, or new facts obtained during discovery

49.    **Numerosity.** The Class is so numerous that joinder of all members in one action is impracticable. The exact number and identities of the members of the Class is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, but on information and belief, Plaintiff alleges that there are in excess of 1,000 members of the Class.

50.    **Typicality.** Plaintiff's claims are typical of those of other members of the Class, all of whom have suffered similar harm due to Defendants' course of conduct as described herein.

51.    **Adequacy of Representation.** Plaintiff is an adequate representative of the Class and will fairly and adequately protect the interests of the Class. Plaintiff has retained attorneys who are experienced in the handling of complex litigation and class actions, and Plaintiff and her counsel intend to diligently prosecute this action.

52.    **Common Questions of Law or Fact.** Common questions of law and fact exist as to all members of the Class that predominate over any questions affecting only individual members of the Class. These common legal and factual questions, which do not vary among members of the Class, and which may be determined without reference to the individual circumstances of any member of the Class, include, but are not limited to, the following:

    a.    Whether Defendants held funds belonging to members of the Class.

    b.    Whether Defendants were obligated to return funds to members of the Class.

    c.    Whether Defendants converted and/or refused to return funds belonging to members of the Class.

    d.    Whether Defendants failed to adequately track, safeguard, and maintain funds belonging to members of the Class.

    e.    Whether Plaintiff and the Class have sustained damages.

    f.    Whether Plaintiff and the Class are entitled to restitution.

    g.    Whether injunctive relief is appropriate and necessary.

      h.   Whether Defendants' conduct was undertaken with conscious disregard of the rights of the members of the Class and was done with fraud, oppression, and/or malice.

53.    **Superiority.** A class action is superior to other available methods for the fair and efficient adjudication of this controversy because individual litigation of the claims of all members of the Class is impracticable. Requiring each individual class member to file an individual lawsuit would unreasonably consume the amounts that may be recovered. Even if every member of the Class could afford individual litigation, the adjudication of at least tens of thousands of identical claims would be unduly burdensome to the courts. Individualized litigation would also present the potential for varying, inconsistent, or contradictory judgments and would magnify the delay and expense to all parties and to the court system resulting from multiple trials of the same factual issues. By contrast, the conduct of this action as a class action, with respect to some or all of the issues presented herein, presents no management difficulties, conserves the resources of the parties and of the court system, and protects the rights of the members of the Class. Plaintiff anticipates no difficulty in the management of this action as a class action. The prosecution of separate actions by individual members of the Class may create a risk of adjudications with respect to them that would, as a practical matter, be dispositive of the interests of the other members of the Class who are not parties to such adjudications, or that would substantially impair or impede the ability of such non-party Class members to protect their interests.

## VII.   CAUSES OF ACTION

### <u>COUNT I</u>
### MONEY HAD AND RECEIVED

54.    Plaintiff restates and incorporates paragraphs 1-53.

55.    Plaintiff brings this count against all Defendants.

56.     Plaintiff and the Class each registered accounts on one or more FinTech platforms that contracted with and utilized Synapse's services.

57.     Plaintiff and the Class each deposited funds at one or more of the Partner Banks through the FinTech platforms.

58.     Defendants had in their possession funds belonging to Plaintiff and the Class. Plaintiff and the Class are the owners, and entitled to possession, of their respective funds deposited with Defendants.

59.     Defendants have not returned the funds belonging to Plaintiff and the Class in full.

60.     Defendants have refused access to the funds belonging to Plaintiff and the Class.

61.     Accordingly, as more fully set forth above, Defendants had in their possession money which in equity and good conscience belongs to Plaintiff and proposed Class members. That money should be refunded to Plaintiff and proposed Class Members.

## COUNT II
## NEGLIGENCE

62.     Plaintiff restates and incorporates paragraphs 1-53.

63.     Plaintiff brings this count against all Defendants.

64.     Plaintiff and the Class share a special relationship with the Defendants that obligates the Partner Banks to meet certain duties toward Plaintiff and Class Members. These duties include: (a) safeguarding cash deposits for the benefit of Plaintiff and the Class; (b) allowing them to access their deposited funds upon demand and/or with reasonable notice; (c) preventing unreasonable interference with their right and ability to retrieve their money; and (d) employing commercially prudent procedures to accurately record and manage those funds.

65.     Defendants breached these duties by failing to properly maintain, account for, and safeguard Plaintiff's and Class Members' deposits, as well as by unjustifiably restricting access to those deposits.

66.     The resulting harm to Plaintiff and Class Members was entirely foreseeable. Defendants were fully aware that consumers depend on financial institutions to securely hold their funds and provide prompt access.

67.     Defendants also knew that refusing or delaying access to deposits would cause harm far beyond the account balance itself, including an inability to pay bills, loans, or basic living expenses.

68.     As a direct and proximate outcome of the Partner Banks' failures, Plaintiff and the Class have been deprived of their deposits, denied access to those funds, and deprived of any accrued interest.

69.     Plaintiff and the Class have further experienced emotional distress, anxiety, and fear upon being informed that their accounts were frozen and their deposits were either inaccessible or misplaced.

70.     On behalf of herself and the Class, Plaintiff seeks damages, along with accrued interest, in an amount to be established at trial.

## COUNT III
## CONVERSION

71.     Plaintiff restates and incorporates paragraphs 1-53.

72.     Plaintiff brings this count against all Defendants.

73.     Plaintiff and the Class initially placed their cash deposits with Defendants, expecting them to safeguard these funds appropriately.

74.     Plaintiff and the Class demanded the immediate return of their deposited funds, yet Defendants unlawfully refused to comply. In fact, Defendants either failed to return, misplaced, or otherwise mishandled property that rightfully belonged to Plaintiff and the Class.

75.     Plaintiff and the Class owned—and were entitled to possess—the deposited funds from the moment they entrusted those funds to the Partner Banks.

76.     The converted funds are both specifically identifiable and set in a known amount.

77.     Defendants' misconduct directly caused Plaintiff and the Class to suffer harm and injury.

78.     At no time did Plaintiff or the Class consent to the improper acts or omissions described herein.

79.     As a direct consequence of Defendants' actions, Plaintiff and the Class have sustained damages in an amount to be proven at trial. Plaintiff, on behalf of herself and the Class, seek all available remedies, including general, special, and punitive damages, injunctive relief, attorneys' fees, and costs.

## <u>COUNT IV</u>
## BREACH OF IMPLIED CONTRACT

80.     Plaintiff restates and incorporates paragraphs 1-53.

81.     Plaintiff brings this count against all Defendants.

82.     Plaintiff and the Class placed their deposits with Defendants as a condition of receiving Defendants' services. In so doing, Plaintiff and the Class entered into implied contracts with Defendants by which Defendants agreed to safeguard and protect their deposits and to disburse the funds at Plaintiff's and the Class members' order and direction.

83.     At the time Defendants obtained the cash deposits of Plaintiff and the Class, there was a meeting of the minds and mutual understanding that Defendants would follow their customers' instructions regarding disbursements from their accounts.

84.     Implicit in these agreements between Plaintiff, and the Class and Defendants was the latter's obligations to: (a) safeguard cash deposits for the benefit of Plaintiff and the Class; (b) allow them to access their deposited funds upon demand and/or with reasonable notice; (c) prevent unreasonable interference with their right and ability to retrieve their money; and (d) employ commercially prudent procedures to accurately record and manage those funds.

85.     Plaintiff and the Class would not have entrusted their cash deposits to Defendants had they known that Defendants would willfully and/or negligently fail to meet these obligations.

86.     Plaintiff and the Class fully performed their obligations under the implied contracts with Defendants.

87.     Defendants breached the implied contracts they made with Plaintiff and the Class by failing to disburse funds as directed, by failing to prevent interference with Plaintiff's and the Class members' right to access their funds, and failing to use reasonable procedures to account for and manage consumer funds.

88.     As a direct and proximate result of Defendants' above-described breach, Plaintiff and the Class have suffered harm and have sustained damages in an amount to be proven at trial. Plaintiff, on behalf of herself and the Class, seeks all available remedies, including actual, consequential, and nominal damages.

### COUNT V
### BREACH OF FIDUCIARY DUTY

89.     Plaintiff restates and incorporates paragraphs 1-53.

90.     Plaintiff brings this count against all Defendants.

91.     Acting as custodians of Plaintiff's and the Class's deposits, Defendants bore a fiduciary responsibility to properly store, maintain, and protect those cash funds. This included holding the deposits exclusively for Plaintiff's and the Class's benefit and refraining from any sale, loan, or other transfer except as explicitly directed by Plaintiff and the Class.

92.     By extension, Defendants' fiduciary obligations also required them to facilitate access to these deposits and to return the funds promptly upon a reasonable request.

93.     Plaintiff and the Class entrusted their assets to Defendants under the expectation that those assets would be safeguarded, and that they would retain immediate and comprehensive control over their accounts.

94.     Nevertheless, Defendants breached these fiduciary duties. They failed to protect Plaintiff's and the Class's cash deposits, did not employ reasonable measures to confirm the accuracy of balances, and denied or delayed timely access to these funds.

95.     As a result, Plaintiff and the Class have suffered damages in an amount to be determined at trial. On their behalf, Plaintiff seeks all available remedies, including general and special damages, punitive damages, injunctive relief, attorneys' fees, and costs.

## COUNT VI
## UNJUST ENRICHMENT

96.     Plaintiff restates and incorporates paragraphs 1-53.

97.     Plaintiff brings this count against all Defendants.

98.     Plaintiff brings this count in the alternative to Count IV.

99.     Plaintiff and Class Members each opened accounts on one or more FinTech platforms that partnered with Synapse's services.

100.    Through these FinTech platforms, Plaintiff and Class Members deposited funds with one or more of Defendants.

101.    As a result, Defendants came into possession of funds that rightfully belonged to Plaintiff and Class Members.

102.    To date, Defendants have not returned the entirety of those funds.

103.    By continuing to hold these cash deposits, Defendants have been unjustly enriched.

104.    Defendants have further benefited from accruing interest and generating other profits through the unauthorized use of Plaintiff's and Class Members' money.

105.    Under these circumstances, retaining the funds is both unfair and inequitable.

106.    As a direct and foreseeable result of this misconduct, Plaintiff and Class Members are entitled to seek restitution and disgorgement in an amount to be determined at trial.

<u>**COUNT VII**</u>
**ACCOUNTING**

107.    Plaintiff restates and incorporates paragraphs 1-53.

108.    Plaintiff brings this count against all Defendants.

109.    Plaintiff and the Class established accounts on one or more FinTech platforms that utilized Synapse's services.

110.    Through these FinTech platforms, Plaintiff and the Class deposited funds with one or more of the Partner Banks.

111.    As a result, the Partner Banks came into possession of funds belonging to Plaintiff and the Class.

112.    Nevertheless, the Partner Banks have failed to return the entirety of those funds.

113.    The Partner Banks have also denied Plaintiff and the Class access to their funds.

114.    Further, the Partner Banks have neither provided an accounting nor supplied sufficient information and documentation regarding the amount and location of Plaintiff's and the Class's deposits.

115.    Plaintiff and the Class therefore have the right to an accounting to ascertain where their funds are and in what amounts.

116.    A remedy at law is inadequate under these circumstances, because without such an accounting, Plaintiff and the Class cannot accurately determine the extent of their damages resulting from Defendants' misconduct.

**COUNT VII**
**CONSTRUCTIVE TRUST**

117.    Plaintiff restates and incorporates paragraphs 1-53.

118.    Plaintiff brings this count against all Defendants.

119.    Plaintiff and the Class established accounts on one or more FinTech platforms that utilized Synapse's services.

120.    Through these FinTech platforms, Plaintiff and the Class deposited funds with one or more of the Partner Banks.

121.    As a result, the Partner Banks came into possession of funds belonging to Plaintiff and the Class.

122.    Nevertheless, the Partner Banks have failed to return the entirety of those funds.

123.    The Partner Banks have also denied Plaintiff and the Class access to their funds.

124.    In the interest of equity and fairness, the Partner Banks should be deemed to hold these funds in constructive trust on behalf of Plaintiff and the Class.

125.    Plaintiff and the Class are entitlted to the imposition of a constructive trust on any of the Partner Banks' accounts that contain their funds.

## VIII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the proposed Class, respectfully

prays for the following relief:

    a.   Certification of this case as a class action on behalf of the proposed Class and any subclasses defined above, appointment of Plaintiff as Class representative, and appointment of their counsel as Class counsel;

    b.   An award to Plaintiff and the proposed Class and subclasses of restitution and/or other equitable relief, including, without limitation, disgorgement;

    c.   An injunction ordering Defendants to cease the business practices complained of herein;

    d.   An award of all economic, monetary, actual, consequential, and compensatory damages caused by Defendants' conduct;

    e.   An award of nominal, punitive, and statutory damages where available;

    f.   Reasonable expenses and attorneys' fees;

    g.   Pre- and post-judgment interest, to the extent allowable; and

    h.   For such further relief that the Court may deem just and proper.

## IX.   JURY TRIAL DEMAND

Plaintiff, individually and on behalf of the proposed Class, demands a trial by jury for all

claims so triable.


Dated:  January 10, 2025                    Respectfully Submitted,

                                        */s/ Andrew J. Shamis*
                                        Andrew J. Shamis
                                        **SHAMIS & GENTILE, P.A.**
                                        14 NE First Avenue, Suite 705
                                        Miami, Florida 33132
                                        Telephone: 305-479-2299
                                        Email:ashamis@shamisgentile.com

                                        Brian Levin *
                                        **LEVIN LAW, P.A.**
                                        2665 South Bayshore Drive, PH2B

Miami, Florida 33133
(305) 613-0318 (Mobile)
(305) 539-0593 (Miami - Direct Dial)
(248) 270-7338 (Bloomfield Hills)
Email: brian@levinlawpa.com

Adam A. Schwartzbaum *
**EDELSBERG LAW, P.A.**
20900 NE 30th Ave., Suite 417
Aventura, FL 33180
Office: 786-289-2643
Email: adam@edelsberglaw.com

*Pro Hac Vice* to be submitted
*Counsel for Plaintiff and the Proposed Class*